THOMSON–HOUSTON ELECTRIC CO. v. ELMIRA & HORSEHEADS RY. CO.

(Circuit Court, N. D. New York. June 19, 1895.)

No. 6,130.

1. PATENTS — TWO PATENTS FOR SAME INVENTION — PATENT FOR MINOR IMPROVEMENTS.

While a second patent issued to the same person for the same invention is void, yet the granting of a patent for minor improvements pending an application for the broad invention will not invalidate a patent subsequently granted for the latter, where the purpose of the first patent was obvious, so that the public had due and formal notice thereof.

2. SAME — INFRINGEMENT SUITS.

Where an infringing machine was purchased from a corporation having no right to sell it, and afterwards this corporation, as well as the corporation owning the patent, came under the control of a dominant corporation, *held*, that this fact did not, on the ground of estoppel, prevent the bringing of an infringement suit, in the name of the corporation owning the patent, against the purchaser.

3. SAME — ELECTRIC RAILWAYS.

The Van Depoele patent, No. 424,695, for improvements in suspended switches and traveling contacts for electric railways, construed, and *held* valid and infringed, except as to certain claims.

4. SAME.

The use of numerous claims, covering practically the same subject-matter by different forms of expression, criticised.

### Final Hearing in Equity.

This action is brought by the Thomson-Houston Electric Company against the Elmira & Horseheads Railway Company, a corporation operating an electric railway in the city of Elmira, N. Y., for the infringement of letters patent, No. 424,695, granted April 1, 1890, to Charles J. Van Depoele for improvements in suspended switches and traveling contacts for electric railways. The original application was filed March 12, 1887. It was divided and the application for the patent in suit was filed October 22, 1888. The invention relates to mechanisms and combinations thereof by which an electric railway having branches and turnouts may be operated automatically without regard to the height of the conducting wire, or its parallelism to the center of the rails. The specification says: "My present invention relates to electric railways of the class in which a suspended conductor is used to convey the working-current, a traveling contact carried by the car being employed for taking off the current for use in operating the motor by which the car is propelled. The return-circuit is preferably completed through the rails of the track. My invention consists in certain devices and their relative arrangement by means of which a contact device carried by a rod or pole extended from the car and pressed upwardly into contact with the conductor is switched from one line to another correspondingly with the vehicle. * * * More particularly my invention consists in a track-switch for the vehicle, a conductor-switch for the contact device or 'trolley,' as it is termed, and the trolley device attached to the vehicle, these elements being so arranged relatively to one another that in operation the vehicle reaches the track-switch and is diverted laterally before the trolley reaches the conductor-switch, whereby the trolley, which partakes of the lateral movement of the vehicle, has imparted to it a lateral-moving tendency before its switch is reached, and it therefore passes through the switch in a proper direction, corresponding to

the movement of the vehicle. My invention also consists in various details of construction and arrangement, which will be hereinafter pointed out." The inventor after describing the drawings continues as follows: "In order that the contact-wheel, E, shall be compelled to pass from one conductor to a branch or one attached thereto leading in a different direction, I provide the inverted open-bottom metallic boxes, I, which are formed with branching compartments and constructed in the form of switches, conforming to the curves and angles of the track-switches by which the direction of the car is controlled. These boxes are in the form of open smooth curved passages and are free from obstructions within so that the contact-wheel, E, which is slightly depressed on meeting the end of the switch-box, may roll freely therethrough and move laterally therein in the desired direction without hindrance. * * * The electric switches, I, are to be placed directly over— that is to say, above—their counterparts. The track switches and the contact-wheel, as before stated, are to be located so that as the front portion of the car swings in the desired direction as the front wheels pass the track-switch the contact arm will be deflected and the direction of the wheel, E, correspondingly changed while still on the straight wire, so that on reaching the switch box the wheel will be depressed and pass thereinto and naturally pass through and out of the proper compartment thereof. The switch boxes, I, being connected directly to the conductors, D, are similarly charged and when the wheel, E, is passing therethrough the current passes through the box, I, and thence into the contact-wheel, through its flanges, e, passing thence through the arm, F, or a separate conductor to the motor, C. Since there are no moving tongues or springs or points to catch or impede the progress of the wheel when three or four grooves, as the case may be, exist in one switch-box, the wheel will intersect the grooves and pass along in the desired direction and go through without any difficulty whatever, its direction being previously indicated by the movement of the front portion of the car. Thus it will be seen that by locating my traveling contact-wheel in the position shown or one equivalent thereto I obviate all the difficulties of switching from conductor to conductor and with the smallest possible amount of special construction. I believe myself to be the first to devise this arrangement of contact device and switches, whereby the lateral movement of the vehicle is first imparted to the trailing-contact arm and the contact-wheel is then flexibly, yet without interruption of contact, drawn into the switch and guided thereby into engagement with the desired branch conductor, and I intend herein to claim broadly, any relative arrangement of track-switch, conductor-switch, vehicle, and contact device by means of which the former switch will act in advance of the latter and the vehicle impart a lateral tendency to the trailing contact by the time it engages with the conductor-switch. The contact-carrying arm described in the present application possesses substantial practical advantages over any other means yet proposed for establishing moving contact between a vehicle and a stationary supply-conductor, in that by the use of a hinged flexibly-mounted arm much greater freedom of movement is compatible with the maintenance of a positive mechanical connection and electrical contact between the vehicle and supply conductors."

The patent may be divided as follows: First, the contact device, commonly known as the "trolley;" second, the support therefor; and, third, the overhead switching devices. The contact device belongs to the class known as "under-running" contacts. It consists of a grooved wheel mounted upon a pivoted support on the roof of the car having a sufficient capacity of vertical and lateral automatic adjustability and capable of being detached and lowered by an attendant on the car platform. This support is a pole or arm mounted on the roof of the car and pivoted and swiveled so as to be capable of swinging both vertically and horizontally. Attached to the short arm of this pole is a weighted spring which operates to maintain normal contact between the grooved wheel and the suspended conductor. The overhead switching devices are placed at points on the line of the road where branches and turnouts occur, and where the overhead trolley wires are required to branch correspondingly with the tracks. The object is to transfer the trolley from the main wire to the branch wire and vice versa without interrupting the contact. The switching device as shown in the patent consists of a Y-shaped plate of sheet metal, with depending side flanges. This plate is secured to the underside of the trolley wire at the point where it branches, the narrow end being turned in the direction of the main wire and the other end being connected with both the main and branch wire. The narrow end is wide enough to permit of the easy movement of the trolley-wheel through it

while the other end is wide enough to permit the wheel to move out in the direction of either the main or the branch wire. The switch device is placed at the junction of the main and branch wire above the corresponding switch on the track and the wheel is to be so supported on the roof of the car that it will not reach the switch box until at least the forward wheels of the car have passed the junction of the main and branch track. Thus the switch box will guide the wheel automatically upon that one of the trolley wires which corresponds with the track upon which the car has been directed.

The patent contains 35 claims, all of which are said to be involved, except those relating to the fender for the trolley wheel. These so-called "fender claims," numbered 18, 28, 29 and 30, were withdrawn at the argument. The other claims may be divided into groups as follows:

"Claims relating to the construction and attachment of the conductor switch.

"(1) The combination, with crossing or branching overhead wires, of a plate along the top of which said wires pass, and deflecting-ribs at the lower side of said plate at its extremities. (2) The combination, with an overhead conductor arranged to receive a traveling underneath contact, of a switching device secured to and depending from the conductor. (3) The combination, with an overhead wire for receiving an underneath contact, of a switch-plate attached to the wire in about the same horizontal plane as the wire. (9) In an electric railway, a switching device for suspended conductors, comprising two or more branching compartments or ways corresponding to the direction of the track, and of the main and branch conductors, and secured to the said suspended conductors, substantially as described. (10) In an electric railway, a switching device for suspended conductors, consisting of an open-bottom box formed with two or more branching compartments corresponding to the direction of the track and arranged to be secured to the conductor, substantially as described. (11) The combination, with an overhead line-wire, of a grooved contact device pressed against the wire and receiving the wire between the flanges of the groove, and a guiding switch-plate connected to the wire against which the said flanges bear in passing from one line to another. (12) In an electric railway having an electric conductor suspended above the track, a switching device supported by the conductor and formed with downwardly-open compartments or ways corresponding with the direction of the track, said ways being substantially flat at their upper sides to form paths for the flanges of the contact-trolleys, substantially as described. (13) In an electric railway, a switch for suspended conductors, consisting of a box formed with branching compartments corresponding with the branches of the conductor, and of the track-switches and secured to the said suspended conductors, substantially as described. (14) In an electric railway, a switch for suspended conductors, consisting of a box formed with branching compartments corresponding with the branches of the conductor, and of the track-switches, and secured to and depending from the said suspended conductor, substantially as described. (19) In an electric railway, the combination, with branching overhead conductors, of an upwardly-pressed contact-arm carrying a grooved wheel embracing the conductor, and a switch-plate at the branching point adapted to receive the tips of the wheel flanges, and provided with depending ribs, between which the wheel is free to move laterally to engage with one of the branch conductors. (23) The combination, with branching overhead conductors, of a vehicle having a laterally-swinging contact-arm pressed upward to engage the conductors, and a switch-plate at the branching point having depending sides, but open at its extremities, the interior width of the plate between the sides being greater than the thickness of the contact-wheel, whereby the wheel is free to move laterally with relation to the main conductors and engage one of the branching conductors.

"Claims relating to the centralizing spring.

"(21) In an electric railway, the combination, with main and branch overhead conductors, of a vehicle, an intermediate contact-arm thereon movable laterally with respect thereto, a spring tending to return the arm to its normal central position, a guiding-switch at the branching point of the conductor, and a track-switch for the vehicle located so as to operate in advance of the conductor-switch, whereby the lateral tendency of the contact device at the branching point is imparted to it by the vehicle, while its outer extremity is flexibly guided by the overhead switch from main to branch conductor. (24)

In an electric railway, the combination, with branching line-conductors, of a track-switch, a vehicle, an intermediate contact-arm swinging laterally with respect to the vehicle, but provided with a spring tending to restore it to its normal central position, and a lateral deflecting-switch at the branching point of the conductors, whereby the extremity of the contact-arm may be flexibly guided from main to branch conductor. (31) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device consisting of a trailing arm having a grooved contact-wheel at its outer end and moving laterally relatively to the vehicle, but provided with a spring tending to retain it in its normal central position. (32) In an electric railway, the combination, with an overhead conductor and a vehicle, of a trailing contact-arm guided at its outer end by the overhead conductor, and movable laterally relatively to the vehicle, but having a normal centralizing tendency by means of a spring or weight. (33) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device consisting of an upwardly-pressed trailing arm having a grooved contact-wheel at its outer end by which it is guided by the conductor, the said arm being free to swing laterally relatively to the vehicle, but tending to remain in its normal central position by means of a spring or weight. (34) The combination, with a vehicle and an overhead conductor, of a trailing contact-arm guided normally by the conductor, but having a spring-connection with the vehicle tending constantly to maintain it in a definite position, while at the same time it is free to swing laterally with respect to the vehicle against the pressure of the said spring. (35) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device consisting of a rearwardly-extending arm guided at its outer extremity by engagement with the conductor and movable laterally relatively to the vehicle, but having a spring or weight tending to restore it to its normal central position.

"Claims relating to the weighted tension spring.

"(15) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a contact-carrying arm pivotally supported on top of the car and provided at its outer end with a contact-roller engaging the under side of the suspended conductor, and a weighted spring at or near the inner end of the arm for maintaining said upward contact, substantially as described. (16) In an electric railway, the combination of a car, provided with a pivoted arm, as F, having a contact at its outer extremity, a tension-spring, as G, attached at its inner extremity, and a vertically-moving weight connected to said spring for holding the same in operative relation to the arm throughout its entire range of movement, substantially as described. (17) In an electric railway, the combination of the car having suitably-pivoted arm, F, carrying a contact-wheel at its outer extremity, a spring, G, secured to its lower extremity, and a connection extending from said spring and provided with a weight at its lower end, substantially as described.

"Claims relating to the directive action of the track switch, or the combination of the conductor switch and trolley, with the track switch.

"(4) The combination of a track having switches, an overhead conductor above the track and having switches, and a car on the track provided with a contact-carrying arm arranged to engage the conductor at a point in rear of the front wheels of the car. (5) In an electric railway, the combination of a track having suitable switches, an electric conductor suspended above said track and having switches located above the track-switches, and a car on said track provided with an upwardly-extending arm carrying a contact-wheel arranged to engage the suspended conductor at a point in rear of the front wheels of the car, substantially as described. (6) In an electric railway, the combination of an electrically-propelled car, a supply-conductor suspended over the line of travel of the car, a swinging arm mounted upon the car and carrying a contact device at its free end, said contact arranged to bear against said conductor, suitable switching devices upon the track traversed by the wheels of the car, and corresponding switches on the suspended conductors located above those on the track and arranged to engage the contact devices, substantially as described. (7) In an electric railway, the combination of a track having suitable switches, an electric conductor suspended above said track and

having switches located above the track-switches, a car on said track provided with a swinging arm carrying a contact-wheel arranged to engage the suspended conductor, and switches at a point in rear of the front wheels of the car, whereby the contact-wheel is directed through the proper part of the suspended switch, substantially as described. (8) In an electric railway, the combination of a switch or turn-out on the track and a corresponding one on the overhead line, the same being so arranged relatively that the car will reach the switch or turn-out before the trolley does, substantially as described. (20) In an electric railway, the combination, with an overhead switch-plate having depending ribs, but open at its extremities, of main and branch conductors extending from its two extremities, respectively, a vehicle, an upwardly-pressed contact-arm attached to the vehicle and tending to move laterally therewith, and a track-switch for the vehicle located so as to operate in advance of the conductor-switch. (22) In an electric railway, the combination, with main and branch conductors, of a vehicle, a contact-arm thereon having vertical and lateral spring-pressure, a switch-plate for the conductors, and a track-switch for the vehicle located so as to operate in advance of the conductor-switch, whereby the lateral tendency of the contact device at the branching point is imparted to it by the vehicle, while its outer extremity is flexibly guided by the overhead switch from main to branch conductor. (25) In a branching electric railway, the combination of a track-switch, an overhead conductor-switch, and a vehicle having a rearwardly-extending contact-arm whereby the track-switch will operate in advance of the conductor-switch. (26) In a branching electric railway, the combination, with a vehicle, of a track-switch, an overhead conductor-switch, and a contact-arm extending upward from the vehicle to the conductor, and so located relatively to the length of the vehicle and the two switches that the lateral movement of the vehicle will give a corresponding movement of the contact device on the conductor-switch. (27) In a branching electric railway, the combination, with a vehicle, of a track-switch, a contact device consisting of a trailing spring-pressed arm having a grooved contact-piece embracing the conductor and guided thereby, the said arm being jointed to the car and tending to move laterally therewith, and an over-head conductor-switch adapted to engage the contact-piece and whereby the extremity of the arm is flexibly guided from main to branch conductor."

The parties do not agree as to the grouping of some of these claims, but it is thought that the above arrangement is as convenient as any.

The defenses are anticipation, lack of patentability, noninfringement, and as to a part of the defendant's cars, estoppel because of an alleged license.

Samuel A. Duncan and Frederic H. Betts, for complainant.

William A. Jenner, Edwin B. Smith, and Thomas B. Kerr, for defendant.

COXE, District Judge. The patent in controversy deals with a comparatively new art. Electricity has so completely supplanted horse power as a means for propelling street cars that it is difficult to realize that only about 10 years have passed since the first successful electric railroad was installed. At the present time there are more than 500 roads in operation, employing an immense army of workmen and a vast amount of capital. That this wonderful result was accomplished only after innumerable difficulties and obstacles had been encountered and overcome is manifest. The potentialities of the art attracted a large number of brilliant and ingenious men who, for more than a decade, have been laboring to make electric railroading successful. Even after the necessities of the situation had evolved the fundamental principle of taking the electricity from an overhead conductor the difficulties in finding suitable contact and switching devices for a long time prevented commercial success and the solution of the problem taxed the in-

genuity of a large number of inventors. Although the electric road of to-day is a composite organism to which many ingenious and able men have contributed, yet it cannot be denied that to Van Depoele, more than to any other man, belongs the credit of having made it a practical working success. His contributions to the art rapidly supplanted the crude and tentative prior structures and have continued in use until the present time. No one can read this record without being impressed with the truth of this proposition, and, this being so, the court naturally approaches this controversy in liberal spirit and with an inclination to give the inventor the full fruits of his invention. If there be any deviation from this determination it is due to the fact that he has obscured his real invention in a multitude of fuliginous and attenuated claims many of which can only be distinguished when their language is subjected to the most searching analysis. He has particularly pointed out his invention in the description, but, because of this seemingly needless verbosity, he has claimed it indistinctly, to the annoyance of the public, and especially that part of the public which is called upon to construe the patent. A fair amount of tautology and reiteration is prudent and permissible in the claims of a patent, but it is hardly conceivable that it requires 35 claims to secure a comparatively simple mechanical invention. Where the patentee has taken pains to cover every shadow of a shade in his claims the range of construction is limited and he must be held strictly to language which he has adopted with such painstaking deliberation and exactness.

Generally speaking the patent covers devices and combinations by which electric cars are run automatically upon branches and turnouts, the motor being supplied from an overhead system of wires. This is done by a trailing under-running trolley mounted on a long pivoted arm supported on the top of the car and pressed up against the wire by a spring, or equivalent device. This arm has sufficient horizontal and perpendicular movement to adjust itself automatically to the wire, although the wire may not at all times be directly above the center of the rails or suspended at the same distance above the car. The conductor without leaving the platform of the car has full control of the trolley. The other important device used by the inventor is an overhead switch so mounted on the wire that when the forward wheels of the car take the track switch a trend or direction is given to the trolley so that when it reaches the overhead switch it is guided to the proper branch automatically without in any manner disturbing the electric current or the running of the car. In this way a system is produced which is well-nigh perfect in its essential details. That it was necessary in order to attain this result to surmount many difficulties and solve many problems might almost be assumed by the court, but it is abundantly proved by the record.

It is argued by the defendant that the patent is void because all of the inventions claimed therein—except claims 15, 16 and 17, which are not infringed—are covered by earlier patents to Van

Depoele. There is no dispute as to the law. It is fundamental that two patents cannot be granted for the same invention. Where two patents for the same invention issue to the same person the second patent is void. The supreme court in Miller v. Manufacturing Co., 151 U. S. 186, 14 Sup. Ct. 310, lays down no new rule of law. It simply adheres to the old rule which is well stated in the syllabus as follows:

"No patent can issue for an invention actually covered by a former patent, especially to the same patentee, although the terms of the claims may differ.

"The second patent, in such case, although containing a claim broader and more generical in its character than the specific claims contained in the prior patent, is also void.

"But where the second patent covers matters described in the prior patent, essentially distinct and separable, and distinct from the invention covered thereby, and claims made thereunder, its validity may be sustained."

The question here is, are the inventions of the patent in suit all covered by prior patents to Van Depoele? The patent chiefly relied upon by the defendant is No. 397,451, dated February 5, 1889, for improvements in "overhead contacts and switches." The application was filed November 12, 1888, while the application for the patent in suit was pending in the patent office, the original application being filed March 12, 1887, and the divisional application October 22, 1888. At line 9 of No. 397,451, the patentee says: "My invention relates to improvements in electric railways and includes improvements upon the invention forming the subject-matter of a prior application," viz.: the original application for the patent in suit. It is manifest on reading this patent that it was intended to secure a few minor improvements upon the broad invention then pending in the patent office. The public was given due and formal notice of this intention. No one was misled or injured. The claims of No. 397,451 are wholly insufficient to secure the invention of No. 424,695. An infringer unless he used the peculiar contractions and guide ribs shown in the former would escape all accountability if the latter is held invalid. In other words, it is the patent in suit which protects the basic invention. Destroy this and the inventor is despoiled of his principal contribution to the art. The substance is gone, the shadow remains. A court of equity should be very sure of its premises before reaching a result so unjust, so contrary to the policy of our government, so dispiriting to inventors. A decision holding this patent invalid would simply be a confiscation of Van Depoele's property. Why should he be thus punished? What equities demand it? He made a valuable invention and promptly went with it to the patent office. Subsequently he made what he thought to be improvements and asked for a patent for them also. He could not describe his improvements without referring to his original invention, but he did all in his power to inform the public of the exact situation. The patent for the improvements was issued first, and because the invention was thus, in a sense, disclosed, it is argued that it is lost. In other words, the proposition is that Van Depoele, in endeavoring to secure his improvements in the only way known to the law, has forfeited his

right to the main invention. The supreme court had no difficulty in reaching the decision in the Miller Case, because upon the peculiar facts there disclosed they were convinced that the two patents were for the same invention. Here, to say the least, there is grave doubt whether the two patents are for the same invention. If, to use the hypothesis of the Miller Case, the patents had been granted to different parties, would the apparatus and combinations of the patent in suit infringe the restricted claims of No. 397,451? It is thought not. The patents are susceptible of the construction above suggested, viz.: that the patent in suit is for the broad invention and that No. 397,451 is for improvements in minor details and should be so restricted. This construction gives the inventor the fruits of his inventions, but nothing more, and fully preserves the rights of the public. If the other construction were possible the facts are such that there is every reason why it should not be given. What is said of No. 397,451 is also true of Van Depoele's other prior patents.

It is said that there is no invention in the claims relating to the switching apparatus because the patentee has simply suspended, face downward, the well-known form of railroad switch. Assuming that this is a fair statement of his achievement it does not follow that patentability is wanting. When it is considered that he was dealing with an under-running system, that it was necessary to shift the trolley not only but the mysterious current which the trolley carries, and that he accomplished this result automatically when others failed, it is not difficult to place him above the plane of the mechanic. As was said by Mr. Justice Brown in C. & A. Potts & Co. v. Creager, 15 Sup. Ct. 194:

"But where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries; what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use—particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer. Doubtless a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device and, by improvements thereon, has adapted it to a different industry, may also draw to himself the quality of inventor. * * * Indeed, it often requires as acute a perception of the relations between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo. And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before. The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before. The practiced eye of an ordinary mechanic may be safely trusted to see what ought to be apparent to every one."

Again, in Du Bois v. Kirk, 15 Sup. Ct. 729, the same learned judge says:

"The Kirk invention is undoubtedly a very simple one, and it may seem strange that a similar method of relieving the pressure had never occurred to the builders of bear-trap dams before; but the fact is that it did not, and that it was not one of those obvious improvements upon what had gone before, which would suggest itself to an ordinary workman, or fall within the definition of mere mechanical skill. It was in fact the application of an old device to meet a novel exigency, and to subserve a new purpose. That it is a useful improvement can scarcely be doubted."

The defendant argues that the complainant is estopped from asking a decree against six cars purchased by it from the Sprague Electric Railway & Motor Company in 1890 for the reason that in May, 1892, the General Electric Company acquired a controlling interest in the stock of the Sprague Company and of the complainant. The theory is that the General Electric Company is the real complainant and, as successor to the Sprague Company, it is violating its obligation to the defendant, as vendee of the Sprague Company, in bringing this suit. Even if the complainant had given the defendant a license in May, 1892, it would seem that it might still have a decree for an accounting during the two years that the defendant used the cars without any claim of right. But the court is unable to discern how the complainant's right to maintain this action is affected by the proceedings alluded to. The proposition is this, that one who purchases a patented machine from an infringer and operates it unlawfully for a term of years acquires a right to its use if the vendor and owner of the patent subsequently enter into partnership. The complainant is a legal entity entitled to sue. It has never given the defendant a license to use the cars in question, either express or implied. The defendant never acquired the right from the Sprague Company, for that company had no right to give. How then did the defendant get the right to infringe the complainant's patent? So far as this plea is concerned the defendant stands a naked trespasser claiming to do an unlawful act because of a subsequent arrangement between its vendor, the patent owner and a third corporation, to which it was in no way a party. The complainant has done no act to deceive or mislead the defendant. The latter has parted with nothing and lost no right, relying upon complainant's declarations, for none were made. If the complainant had in any manner induced the defendant to purchase the cars in question, intimating that they did not infringe the Van Depoele patent, the situation would be different, but as it is the case seems devoid of every element of estoppel. The decree should not, of course, include the car purchased of the complainant.

The defendant owns and operates an electric railway at Elmira. The current is supplied to the motor of the cars by a trailing underrunning trolley mounted on the roof of the car. The trolley is pressed up against the wire and the lateral and vertical action of the pole is controlled by springs. Two forms of trolley are used known as the "Anderson" and the "Nuttall." Both are adjustable from the car platform by a cord in the hands of the conductor.

There are about 12 sheet metal pan switches, ten so-called "Murray" switches and two so-called "General Electric" switches, in use on the defendant's road. The Murray switches are used at turnouts, the others at branches. They are so located that "the car has fully passed the track switch before the trolley enters the overhead switch." The circuit remains unbroken while the trolley is passing through.

It remains to consider the claims with reference to the question of infringement.

Claims 15, 16 and 17 are not infringed. One of the elements of the claims is "a weighted spring," or, as it is expressed in claim 16, "a vertically-moving weight connected to said spring," and in claim 17 "a connection extending from said spring and provided with a weight at its lower end." The function of the "weight, H," is pointed out with care in the description. The defendant does not use this weight in any manner whatever and consequently does not infringe. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76; Keystone Bridge Co. v. Phoenix Iron Co., 95 U. S. 274.

I fully agree with the defendant that several of the remaining claims are for the same subject-matter and, in a patentable sense, are not distinguishable. To attempt to differentiate them would, in the language of the Miller Case, "involve the drawing of distinctions too refined for the practical administration of the patent law."

The counsel for the complainant admit that claims 9-14, inclusive, "cover substantially the same ground." Claims 9 and 10 are so nearly alike that the difference is only a verbal one. The language of claims 13 and 14 is identical, except that the latter adds to the former the words "and depending from." What the significance of these words is, in view of the description and other claims, the court is at a loss to conjecture. To analyze all of the claims involved, or, more correctly speaking, the involved claims, and attempt to point out their differences and similarities, would extend this opinion beyond all reasonable length. As the brief for the defendant says, "no special harm can come of it" where several claims for substantially the same invention appear in one patent, but, on the other hand, the issues in these causes should be simplified as much as possible. In view of the admitted similarity of the claims it is possible that the complainant should be compelled to elect which of them it will rely upon, but further discussion of the matter may well be reserved until the settlement of the decree.

Of the claims relating to the construction and attachment of the conductor switch the complainant's counsel regard claim 2 as the leading one in the group. This claim is very broad, but it must be construed in the light of the specification and drawings and so construed fairly secures the invention. Claim 9 is also pointed out as the one which best secures the special features of the switch. From what has been already said of the defendant's railway it is manifest that these claims have been infringed. The particulars of the infringement may be conveniently left to the master.

Claims 4 and 20 are pointed out by complainant's counsel as the leading claims in the group relating to the directive action of the

track switch. Infringement of these claims is satisfactorily established.

Whether or not claims 5, 6 and 7 are infringed it seems unnecessary now to determine.

Of the claims relating to the centralizing spring the complainant seems to rely principally upon the thirty-third as describing with the greatest accuracy the patented construction. It is thought that this claim is infringed by the "Anderson" trolley which is given a centralizing tendency by springs located at its base, but not by the "Nuttall" which has no spring tending to restore it to its normal central position.

It follows that the complainant is entitled to a decree for an injunction and an accounting, but, as the defendant has succeeded as to some of the claims, the decree should be without costs.