THOMSON–HOUSTON ELECTRIC CO. v. BLACK RIVER TRACTION CO.

(Circuit Court, N. D. New York. August 12, 1903.)

1. PATENTS—TWO PATENTS FOR SAME INVENTION—SECOND PATENT FOR ELE-
MENT OF FORMER COMBINATION.
   If the structure described in a patent be a complete and an operative
one, composed of several coacting parts, and it is described and claimed
and patented as a whole, especially when each part is separately de-
scribed and claimed, no other valid patent can be issued to the inventor
for one of those parts.

2. SAME—TRAVELING CONTACT FOR ELECTRIC RAILWAYS.
   The Van Depoele reissued patent, No. 11,872 (original No. 495,443),
for a traveling contact for electric railways, the essential feature of
which is a long arm, hinged and pivoted so as to be capable of swinging
both vertically and horizontally through long arcs, mounted on the top
of an electric car, and adapted for making contact with the under side
of an overhead suspended wire, is void, for the same reason as the
original, because such swinging arm was fully described and claimed
in patent No. 424,695 to the same inventor, as an essential part of the
combination of such patent. The invalidity of the original patent, de-
clared in a number of decisions, was not because it was rendered inop-
erative by reason of defective or insufficient specifications, or for any
other reason which could be obviated by a reissue.

In Equity. The bill of complaint in this suit was filed February 7,
1901, by the complainant against the defendant, to enjoin and re-
strain the defendant from infringing reissued letters patent No. 11,-
872, dated November 13, 1900, issued to A. Wahl and C. A. Coffin,
administrators of C. J. Van Depoele, assignors to Thomson-Houston
Electric Company, for improvement in traveling contacts for elec-
tric railways. The original of this patent is No. 495,443, dated April
11, 1893.

Betts, Betts, Sheffield & Betts (Frederic H. Betts and L. F. H.
Betts, of counsel), for plaintiff.

Harding & Harding (John R. Bennett, George J. Harding, and
Frank S. Busser, of counsel), for defendant.

RAY, District Judge. The claims of the reissued letters patent
are as follows:

"(1) In an electric railway, the combination of a car, an overhead con-
ductor above the car, an upwardly extending and laterally swinging arm
mounted on the roof of the car, and carrying a contact device at its free
end, and making underneath contact with the conductor, substantially as
described.

"(2) In an electric railway, the combination of a car, an electric overhead
conductor above the car and parallel with the line of travel, an upwardly
extending trailing arm carrying a contact device at its free end, adapted to
make underneath contact with the conductor, said arm being supported on
the car on vertical and transverse axes, so as to permit said contact device
to follow the position of the conductor, notwithstanding great variations of
height and of lateral displacement thereof substantially as described."

In the specifications we find the following:

"The said invention relates to electric railways of the class in which a sus-
pended conductor is used to convey the working current, a traveling contact
carried by the car for taking off the current for use in operating the motor

by which the car is propelled, and the return circuit completed through the rails. The invention consists more particularly of an improved traveling contact. This is shown, however, in connection with an improved arrangement and construction of the switches by which the said traveling contact is directed onto the proper conductor; but these devices for switching the traveling contact from one conductor to another have been already claimed in letters patent of the United States No. 424,695, which was issued as a division of this application on April 1, 1890, and said devices are not claimed herein, but the description and illustration of them are here retained to show how the traveling contact is adapted to meet one of the essential requirements of railway service without special arrangements or other complications. The invention also consists in various details of construction and arrangement, which will be hereinafter pointed out. * * * The contact-carrying arm described and claimed in the present application possesses substantial practical advantages over any other means yet proposed for establishing moving contact between a vehicle and a stationary supply conductor, in that by the use of a hinged, flexibly mounted arm much greater freedom of movement is compatible with the maintenance of a positive mechanical connection and electrical contact between the vehicle and supply-conductors. In a previous application, filed June 22, 1885, serial No. 169,410 (see patent No. 403,801), said Charles J. Van Depoele, deceased, has shown and described a contact device consisting of a grooved roller mounted upon a spring, and sustained thereby a short distance above the roof of the car; but this was, in practice, found deficient in capacity to follow the sinuosities and deflections of the overhead conductor as ordinarily put up, and, moreover, necessitated the conductor being supported in inconvenient proximity to the ground, and it also required for its operation a conductor suspended with substantially impracticable accuracy above an ideal track. By the use of such an arm as herein described, which may be of any suitable length, the conductor is supported at a height entirely out of the way of passing teams and the like, and, moreover, the outer end of the arm, being the longest, may also swing laterally through a distance of several feet, to follow deflections or bends in the conductor, without undue or injurious strain upon its pivotal connections. Another great advantage is found in the fact that the outer end of an arm such as described will maintain its contact under great variations of height of conductor, as well as lateral displacement thereof, and may even be depressed to a horizontal position where it is desired to pass under bridges, into buildings, or other places where it may be desirable to place the conductor in a lower plane than in the other portions of the track. Many modifications and minor changes in the invention just described will readily suggest themselves to persons skilled in the art, and the improvement is not limited to the precise details of construction or arrangement shown, as they may be modified without departing from the scope of the invention. The combination with the contact-carrying arm of a weighted spring, or of a weight and spring, as the special means for holding the contact arm pressed upward, and of enabling the motorman to lower the contact wheel, are not claimed herein, because this special improvement has been already claimed in the patent No. 424,695, dated April 1, 1890, which was issued as a division of this application. Nor is there claimed herein the so arranging of a weight or spring (as by causing it to work through suitable grooves or rollers arranged in the car-roof) as to tend to cause the arm to assume a normal central position, or one parallel with the longitudinal center of the car, as that has also been already claimed in said divisional patent, No. 424,695, being an arrangement which is of especial value only in connection with the switches to which said divisional patent more particularly relates. In the present application no special form or arrangement of tension device is essential to or a part of the invention claimed."

The claims of the original patent, No. 495,443, dated April 11, 1893, are as follows:

"(1) The combination of a car, and overhead conductor above the car, an upwardly extending and laterally movable arm carried by the car, and hav-

ing its upper end free, and a contact device carried by the arm at its free end, and making underneath contact with the conductor.

"(2) The combination of a car, an overhead conductor above the car, a contact device making underneath contact with the conductor, and an arm carried by the car and carrying the contact device, and pivoted so as to swing freely around a vertical axis.

"(3) The combination of a car, an overhead conductor above the car, a contact device making underneath contact with the conductor, and an arm hinged to the car on a transverse axis and carrying the contact device, and a spring to press the contact device upward against the conductor.

"(4) The combination of a car, an overhead conductor above the car, a contact device making underneath contact with the conductor, and an arm on the car movable on both a vertical and a transverse axis, and carrying the contact device.

"(5) The combination of a car, an overhead conductor above the car, a contact device making underneath contact with the conductor, an arm on the car movable on both a vertical and transverse axis, carrying the contact device, and a spring for pressing the contact device upward against the conductor.

"(6) In an electric railway, the combination with a suitable track, and a supply conductor suspended above the track, of a car provided with a swinging arm carrying a contact device in its outer extremity, and means for imparting upward pressure to the outer portion of the arm and contact, to hold the latter in continuous working relation with the under side of the supply conductor, substantially as described.

"(7) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a swinging arm supported on top of the car, a contact device carried by one extremity of the arm, and held thereby in contact with the under side of the electric conductor, and a tension device at or near the other end of the swinging arm for maintaining said upward contact, substantially as described.

"(8) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, an arm pivotally supported on top of the car, and provided at its outer end with a contact engaging the under side of the suspended conductor, and a tension spring at or near the inner end of the arm for maintaining said upward pressure contact substantially as described.

"(9) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a contact carrying arm pivotally supported on top of the car, and provided at its outer end with a contact roller engaging the under side of the suspended conductor, and a weighted spring at or near the inner end of the arm for maintaining said upward contact, substantially as described.

"(10) The combination of a suitably suspended conductor, a railway track below said conductor, switches in the track and in the conductor, a car traveling upon the track and provided with an upwardly extending swinging arm pivotally supported upon the car, a contact device carried by the arm for establishing contact with the suspended conductor, said device engaging the conductor, at a point in rear of the front wheels of the car, substantially as described.

"(11) The combination of a conductor suitably suspended along the line of travel, a railway track below said conductor, similar switches in the track and in the conductor, a car traveling upon the track, and provided with a pivotally supported laterally movable swinging arm, carrying a device for establishing contact with said suspended conductor, the connections between the said contact device and the car being positive and in fixed relation thereto, substantially as described.

"(12) In an electric railway, the combination with a car, of a post extending upward therefrom and carrying a suitable bearing, an arm or lever carrying at its outer end a suitable contact roller, and pivotally supported in said bearing, and provided at its inner end with a tension spring for pressing the outer end of the lever carrying the contact wheel upward against a suitable suspended conductor, substantially as described.

124 F.—32

"(13) In an electric railway, the combination of an electrically propelled car, a supply conductor suspended over the line of travel of the car, a swinging arm mounted upon the car, and carrying a contact device at its free end, said contact arranged to bear against said conductor, suitable switching devices upon the track traversed by the wheels of the car, and corresponding switches on the suspended conductor located above those on the track, and arranged to engage the contact devices, substantially as described.

"(14) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a rearwardly extending arm pivotally supported on top of the car, and provided at its outer end with a contact device engaging the under side of the suspended conductor, and a tension spring for maintaining an upward pressure contact with the conductor, substantially as described.

"(15) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a rearwardly extending arm pivotally supported on top of the car so as to swing laterally, and provided at its outer end with a contact device engaging the under side of the suspended conductor, and a tension spring for maintaining an upward pressure contact with the conductor, substantially as described.

"(16) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, an arm pivotally supported on top of the car, and provided at its outer end with a grooved contact wheel engaging the under side of the suspended conductor, and a tension spring for maintaining an upward pressure contact with the conductor, substantially as described."

### And among the specifications we find the following:

"My present invention relates to electric railways of the class in which a suspended conductor is used to convey the working current, a traveling contact carried by the car for taking off the current for use in operating the motor by which the car is propelled, and the return circuit completed through the rails. The invention consists more particularly in an improved traveling contact, and in improved arrangement and construction of the switches by which the said traveling contact is directed onto the proper conductor. These devices for switching the traveling contact from one conductor to another have been already claimed in my patent No. 424,695, which was issued as a division of this application on April 1, 1890. I therefore do not lay claim to them herein, but the description and illustration of them is retained to show how my traveling contact is adapted to meet one of the essential requirements of railway service without special arrangements or other complications. It also consists in various details of construction and arrangement, which will be hereinafter pointed out. In the accompanying drawings, Fig. 1 is a side elevation of a car provided with my improved contact devices, and otherwise embodying my invention. Fig. 2 is an enlarged detail showing the contact wheel in position in the switch box. Fig. 3 is a sectional detail showing the construction of the contact wheel. Fig. 4 is a top plan view of a portion of track showing the conductor, the switch box, and the rails. Fig. 5 is also a plan view, and is similar to the preceding, with the addition of a car shown in dotted lines. Fig. 6 is a diagrammatic representation of an electric railway system. Fig. 7 shows a modified form of contact wheel. Fig. 8 is a diagrammatic representation thereof. Fig. 9 is an elevation on an enlarged scale, partly in section, showing the vertical and transverse axes upon which the contact-carrying arm is sustained. Similar letters denote like parts throughout. The car, A, is supported upon the track, B, and provided with a motor, C, which is connected with the wheels thereof in any of the methods already described by me. D is the suspended working conductor, E is the traveling contact wheel, and F is a hinged arm supported upon a post, f, secured to or extending upward from the roof of the car. To the lower end of the arm, F, is attached a spring, G, to the lower extremity of which is secured a cord which passes downward through suitable grooves or over suitable rollers, and is provided with a weight, II, which serves to hold the spring down

and keep the contact wheel, E, always pressed up against the under side of the conductor, D, at the same time the spring will instantly yield to allow the wheel to pass under the switches or any obstruction. Being held in position by the weight, the motorman can at any time lower the contact wheel by raising the same, rendering the arrangement very convenient for many purposes. In order that the contact wheel, E, shall be compelled to pass from one conductor to a branch, or one attached thereto leading in a different direction, I provide the inverted open bottom metallic boxes, I, which are formed with branching compartments, and constructed in the form of switches, conforming to the grooves and angles of the track switches by which the direction of the car is controlled. These boxes are in the form of open, smooth curved passages, and are free from obstructions within, so that the contact wheel, E, which is slightly depressed on meeting the end of the switch box, may roll freely therethrough in the desired direction without hindrance. The conductors, D, follow the line of the track or tracks, and are preferably located centrally above them, and, at points where the tracks diverge or join the main line, switch boxes, I, are placed, the conductors, D, coming to the said boxes, and being firmly attached to the tops or sides thereof, so that, were there no other support provided them, the said conductors would sustain the box in its proper position, which is directly over the ground or track switch. * * * The contact-carrying arm described and claimed in the present application possesses substantial practical advantages over any other means yet proposed for establishing moving contact between a vehicle and a stationary supply conductor, in that by the use of a hinged, flexibly mounted arm, much greater freedom of movement is compatible with the maintenance of a positive mechanical connection and electrical contact between the vehicle and supply conductors. In a previous application, filed June 22, 1885, serial No. 169,410, I have shown and described a contact device consisting of a grooved roller mounted upon a spring, and sustained thereby a short distance above the roof of the car; but this was, in practice, found deficient in capacity to follow the sinuosities and deflections of the overhead conductor as ordinarily put up, and, moreover, necessitated the conductor being supported in inconvenient proximity to the ground, and it also required for its operation a conductor suspended with substantially impracticable accuracy above an ideal track. By the use of such an arm as here described, which may be of any suitable length, the conductor is supported at a height entirely out of the way of passing teams and the like, and, moreover, the outer end of the arm, being the longest, may also swing laterally through a distance of several feet, to follow deflections or bends in the conductor, without undue or injurious strain upon its pivotal connections. Another great advantage is found in the fact that the outer end of an arm such as described will maintain its contact under great variations of height of conductor, as well as lateral displacement thereof, and may even be depressed to a horizontal position, where it is desired to pass under bridges, into buildings, or other places where it may be desirable to place the conductor in a lower plane than in the other portions of the track."

Infringement of the letters patent in suit is conceded, provided they be valid. The defendant states its position thus:

"Positions of Respondent. The positions of respondent are as follows:

"First. That the reissue describes and claims the same invention as patented in patent No. 424,695, and is therefore invalid.

"Second. That the reissue patent differs from the original patent in breadth or scope, only, and is invalid, in covering the same invention as that covered by patent No. 424,695.

"Third. That if the reissue patent claims or attempts to cover an invention not claimed in the original patent, it is invalid for that reason.

"Fourth. Under complainant's construction of the claims of the reissue patent in suit, as requiring no means for maintaining contact, it is clearly lacking in invention."

The complainant states its position as follows:

"The complainant's position in this case may be briefly stated as follows:

"(1) Van Depoele made at least two perfectly distinct and separable inventions in the trolley art. The generic invention of a long arm, hinged and pivoted so as to be capable of swinging both vertically and horizontally through long arcs, and mounted on the top of an electric car, and adapted for making contact with the under side of an overhead suspended wire. This arm was capable of being actuated by a great variety of mechanism to make and keep underneath contact.

"(2) The subordinate invention was of a special kind, and a special arrangement of mechanism, consisting of a tension spring fastened at the upper end to the arm, and at the lower to a weight hung on a cord which passes through guides in the car roof, so that the lateral swing of the spring (with the arm) was restrained. When thus arranged, or in some equivalent manner, and not otherwise, it acted to 'centralize' the arm, or pull it back to a central position. This special improved kind and arrangement of tension devices was advantageous in passing switches.

"(3) Van Depoele filed on March 12, 1887, an application in which he described and illustrated both the generic invention and the subordinate improvement as embodied in one structure. He claimed the generic invention and the subordinate improvement separately when the application was originally filed.

"(4) The generic claims became involved in a long interference, known as 'Interference A.' Other claims of the application were involved in another interference. The applicant, by a most bungling division of the claims, attempted to separate the two inventions, and the Patent Office acquiesced in his action. The subordinate improvement was patented in and by divisional patent No. 424,695, dated April 1, 1890. It expressly therein stated that it was not intended to patent by it the generic invention, that being reserved. After the result of a successful interference, the applicant took out his patent with the generic claims, but he retained in it as the descriptive portion the same description as had appeared in the prior patent for the specific form or improvement. The complainant has always contended that, as the two inventions had been illustrated together as a single structure in the original application, this was correct practice, although the inventions, as inventions, were separable and distinct.

"(5) The courts have held that, the descriptions being the same, no 'proper line of demarkation had been preserved,' and that the generic claims must be construed as claiming the same thing that had been claimed in the prior patent, and nothing else. Complainant then reissued to correct the mistake in practice."

From the statement of the complainant it is apparent that a mistake in practice was made by the patentee in taking out the original letters patent, No. 495,443, and, those letters patent having been held void, he has obtained a reissue to correct the practice, not to correct an error in the claims or specifications of such letters patent. It would seem plain that the applicant knew what he was doing, but did not understand the effect of his action with the courts, or upon his patents when they came before the courts on the question of their validity.

Section 4916, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3393], provides as follows:

"Sec. 4916. Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the Commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the

corrected specification, to be issued to the patentee, or, in the case of his death or of an assignment of the whole or any undivided part of the original patent, then to his executors, administrators, or assigns, for the unexpired part of the term of the original patent. Such surrender shall take effect upon the issue of the amended patent. The Commissioner may, in his discretion, cause several patents to be issued for distinct and separate parts of the thing patented, upon demand of the applicant, and upon payment of the required fee for a re-issue for each of such re-issued letters patent. The specifications and claim in every such case shall be subject to revision and restriction in the same manner as original applications are. Every patent so re-issued, together with the corrected specification, shall have the same effect and operation in law, on the trial of all actions for causes thereafter arising, as if the same had been originally filed in such corrected form; but no new matter shall be introduced into the specification, nor in case of a machine-patent shall the model or drawings be amended, except each by the other; but when there is neither model nor drawing, amendments may be made upon proof satisfactory to the Commissioner that such new matter or amendment was a part of the original invention, and was omitted from the specification by inadvertence, accident, or mistake, as aforesaid."

After a careful reading of Thomson-Houston Electric Co. v. Hoosick Ry. Co., 82 Fed. 461, 27 C. C. A. 419 (Second Circuit), which holds that letters patent No. 495,443, the original of those now in suit, are invalid as to claims 6, 7, 8, 12, and 16, because for the same invention covered by the prior patent, No. 424,695, to the same inventor, so far as concerns the claims which relate to the combinations between the contact device and the suspended conductor, and to the structural features of the contact device (other of the claims now in question being also discussed), and of Thomson-Houston Electric Co. v. Jeffrey Mfg. Co., 101 Fed. 121, 41 C. C. A. 247 (Sixth Circuit), holding that the said patent No. 495,443, for a traveling contact for electric railways, is rendered invalid by patent No. 424,695, previously issued to the same inventor for precisely the same devices, the only difference being that the earlier patent states an additional function to be performed by one of the elements, and of Thomson-Houston Electric Co. v. Union Ry. Co., 86 Fed. 636, 30 C. C. A. 313, which holds that patent No. 495,443, for a traveling contact for electric railways, must be construed, as to claims 2 and 4, as including, by implication, means for maintaining the contact device and the conductor in their normal working relations, and, so construed, are void, as being for the same invention as letters patent No. 424,495, to the same inventor, this court is at a loss to discover just how or when the difficulty is overcome or remedied by the reissued letters patent No. 11,872, dated November 13, 1900. The complainant seems to contend that the inventor really had three inventions described in, but not covered by, letters patent No. 424,695, and No. 495,443, while not intending it, and that by reissued letters patent No. 11,872 he covers the third or generic invention, omitted by mistake, accident, or inadvertence from the original letters patent. Omitting from consideration the improvement in switches for electric railroads, complainant says he had the generic invention of a long arm hinged and pivoted so as to be capable of swinging both vertically and horizontally through long arcs, and mounted on the top of an electric car, and adapted for making contact with the under side of an overhead sus-

pended wire. He says this arm was capable of being actuated by a great variety of mechanism to make and keep underneath contact. However this may be, certainly to make it operative there must be some sort of connecting mechanism. It matters little how fine an invention (?) a person has, it is not the subject of a valid patent if not operative either in itself, or in connection with the structure of which it is to form a part. And if not operative, as stated, a person who by changes and new combinations makes it operative is entitled to a patent thereon, which cannot be defeated on the ground of anticipation, nor does he infringe the inoperative device if patented.

The complainant says that the subordinate invention was of a special kind, and a special arrangement of mechanism, consisting of a tension spring fastened at the upper end to the arm (long arm above mentioned), and at the lower to a weight hung on a cord which passed through guides in the car roof, so that the lateral swing of the spring (with the arm) was restrained; that when thus arranged, or in some equivalent manner, and not otherwise, it acted to centralize the arm, or to pull it back to a central position. He says that this was advantageous in passing switches. Both the so-called generic and the subordinate inventions were described and illustrated as embodied in one structure, but the inventor claimed them separately when the claim was first filed. Then the applicant (so says the complainant), "by a most bungling division of the claims, attempted to separate the two inventions, and the Patent Office acquiesced in the action." If they were actually claimed separately when the claim was originally filed, how was it that any further separation was necessary? It would seem that the one might easily have been distinguished from the other. The complainant says the subordinate invention, tension spring with weight, etc., was patented (No. 424,695) April 1, 1890. Then were taken out letters patent No. 495,443 (the original of the reissue), for the generic invention (long arm hinged and pivoted, etc., and mounted, etc., and adapted for making contact with the under side of an overhead suspended wire), retaining in this patent the same description, etc., used in taking out letters patent No. 424,695, for what complainant calls the "subordinate invention."

The specifications and claims of letters patent No. 424,695, of April 1, 1890, are in part as follows:

"Be it known that I, Charles J. Van Depoele, a citizen of the United States, residing at Lynn, in the county of Essex, state of Massachusetts, have invented certain new and useful improvements in suspended switches and traveling contacts for electric railways, of which the following is a description:

"This application is a division of serial No. 230,649, filed March 12, 1887. My present invention relates to electric railways of the class in which a suspended conductor is used to convey the working current, a traveling contact carried by the car being employed for taking off the current for use in operating the motor by which the car is propelled. The return circuit is preferably completed through the rails of the track. My invention consists in certain devices, and their relative arrangement, by means of which a contact device carried by a rod or pole extending from the car, and pressed upwardly into contact with the conductor, is switched from one line to another correspondingly with the vehicle. To illustrate my invention, I have shown it applied to a contact device of this description, which forms the subject-matter of my application, serial No. 230,649, of March 12, 1887; and,

while I do not intend to claim generally in this application a contact device of this construction, I have made claims herein to certain details thereof which are of especial value in connection with my improved switching devices, but which are not essential features of the contact device itself, considered without reference to the switch. I also make claims in this application to a switch plate particularly designed for the arrangement which forms the principal subject-matter of this application. More particularly my invention consists in a track switch for the vehicle, a conductor switch for the contact device or 'trolley,' as it is termed, and the trolley itself, attached to the vehicle, these elements being so arranged relatively to one another that in operation the vehicle reaches the track switch and is diverted laterally before the trolley reaches the conductor switch, whereby the trolley, which partakes of the lateral movement of the vehicle, has imparted to it a laterally moving tendency before its switch is reached, and it therefore passes through the switch in the proper direction, corresponding to the movement of the vehicle. My invention also consists in various details of construction and arrangement, which will be hereinafter pointed out.

"In the accompanying drawings, Fig. 1 is a side elevation of a car provided with my improved contact devices, and otherwise embodying my invention. Fig. 2 is an enlarged detail showing the contact wheel in position in the switch box. Fig. 3 is a sectional detail showing the construction of the contact wheel. Fig. 4 is a top plan view of a portion of track, showing the conductor, the switch box, and the rails. Fig. 5 is also a plan view, and is similar to the preceding with the addition of a car shown in dotted lines. Fig. 6 is a diagrammatic representation of an electric railway system. Similar letters denote like parts throughout. The car, A, is supported upon the track, B, and provided with a motor, C, which is connected with the wheels thereof in any of the methods already described by me. D is the suspended working conductor. E is the traveling contact wheel, and F is a hinged arm supported upon a post, f, secured to or extending upward from the roof of the car. To the lower end of the arm, F, is attached a spring, G, to the lower extremity of which is secured a cord which passes downward through suitable grooves or over suitable rollers, and is provided with a weight, H, which serves to hold the spring down and keep the contact wheel, E, always pressed up against the under side of the conductor, D. At the same time the spring will instantly yield to allow the wheel to pass under the switch or any obstruction, and while the arm, F, is movable laterally with respect to the vehicle, the spring and weight will constantly tend to restore the arm to its normal central position, and assist in causing the contact arm to partake of the lateral movement of the vehicle. Being held in position by the weight, the wheel has a much greater range of action, and, moreover, the motorman can at any time lower the contact wheel by raising the same, rendering the arrangement very convenient for many purposes. * * * The arm, F, is of a length that will place the contact wheel, E, about over the rear pair of wheels of the car, and the position of the post, f, and the length of the arm, F, itself, will therefore vary with the length of the body of the car, the particular proportions shown being only by way of illustration. The arm, F, is hinged, and should in most instances be also pivoted to the top of its post, f, although a reasonable amount of looseness in the hinged joint will answer the purpose of the pivot, and prevent binding or straining at that point due to the swaying of the vehicle or deflection of the conductor. The outer end of the arm, F, is forked, and provided with an axle bolt, K, passing through the hub of the contact wheel, E. A fender spring, L, is also attached to the arm, F, and passes on each side of the wheel, E, as far as its hub, and, in case of detachment of the wheel from the wire, D, prevents its getting caught between the hub of the wheel and the forks of the arm, F, rendering it an easy matter for the motorman, by raising the weight, H, to lower the contact wheel and replace it again in operative position. It also prevents any transverse wire being caught in the angle between the arm and the wheel. * * * I believe myself to be the first to devise this arrangement of contact device and switches, whereby the lateral movement of the vehicle is first imparted to the trailing contact arm and the contact wheel is then flexibly, yet without interruption of contact,

drawn into the switch, and guided thereby into engagement with the desired branch conductor; and I intend herein to claim broadly any relative arrangement of track switch, conductor switch, vehicle, and contact device by means of which the former switch will act in advance of the latter, and the vehicle impart a lateral tendency to the trailing contact by the time it engages with the conductor switch. The contact-carrying arm described in the present application possesses substantial practical advantages over any other means yet proposed for establishing moving contact between a vehicle and a stationary supply conductor, in that by the use of a hinged, flexibly mounted arm much greater freedom of movement is compatible with the maintenance of a positive mechanical connection and electrical contact between the vehicle and supply conductors.

"Having described my invention, what I claim, and desire to secure by letters patent, is:

"(1) The combination, with crossing or branching overhead wires, of a plate along the top of which said wires pass, and deflecting ribs at the lower side of said plate at its extremities.

"(2) The combination, with an overhead conductor arranged to receive a traveling underneath contact, of a switching device secured to and depending from the conductor.

"(3) The combination, with an overhead wire for receiving an underneath contact, of a switch plate attached to the wire in about the same horizontal plane as the wire.

"(4) The combination of a track having switches, an overhead conductor above the track and having switches, and a car on the track provided with a contact-carrying arm arranged to engage the conductor at a point in rear of the front wheels of the car.

"(5) In an electric railway, the combination of a track having suitable switches, an electric conductor suspended above said track, and having switches located above the track switches, and a car on said track provided with an upwardly extending arm carrying a contact wheel arranged to engage the suspended conductor at a point in rear of the front wheels of the car, substantially as described.

"(6) In an electric railway, the combination of an electrically propelled car, a supply conductor suspended over the line of travel of the car, a swinging arm mounted upon the car and carrying a contact device at its free end, said contact arranged to bear against said conductor, suitable switching devices upon the track traversed by the wheels of the car, and corresponding switches on the suspended conductor located above those on the track, and arranged to engage the contact devices, substantially as described.

"(7) In an electric railway, the combination of a track having suitable switches, an electric conductor suspended above said track, and having switches located above the track switches, a car on said track, provided with a swinging arm carrying a contact wheel arranged to engage the suspended conductor, and switches at a point in rear of the front wheels of the car, whereby the contact wheel is directed through the proper part of the suspended switch, substantially as described.

"(8) In an electric railway, the combination of a switch or turn-out on the track, and a corresponding one on the overhead line, the same being so arranged relatively that the car will reach the switch or turn-out before the trolley does, substantially as described.

"(9) In an electric railway, a switching device for suspended conductors, comprising two or more branching compartments or ways corresponding to the direction of the track, and of the main and branch conductors, and secured to the said suspended conductors, substantially as described.

"(10) In an electric railway, a switching device for suspended conductors, consisting of an open-bottom box formed with two or more branching compartments, corresponding to the direction of the track, and arranged to be secured to the conductor, substantially as described.

"(11) The combination, with an overhead line wire, of a grooved contact device pressed against the wire, and receiving the wire between the flanges of the groove, and a guiding switch plate connected to the wire, against which the said flanges bear in passing from one line to another.

"(12) In an electric railway having an electric conductor suspended above the track, a switching device supported by the conductor, and formed with downwardly open compartments or ways corresponding with the direction of the track, said ways being substantially flat at their upper sides to form paths for the flanges of the contact trolleys, substantially as described.

"(13) In an electric railway, a switch for suspended conductors, consisting of a box formed with branching compartments, corresponding with the branches of the conductor, and of the track switches, and secured to the said suspended conductors, substantially as described.

"(14) In an electric railway, a switch for suspended conductors, consisting of a box formed with branching compartments, corresponding with the branches of the conductor, and of the track switches, and secured to and depending from the said suspended conductor, substantially as described.

"(15) In an electric railway, the combination of a car, a conductor suspended above the line of travel of the car, a contact-carrying arm pivotally supported on top of the car, and provided at its outer end with a contact roller engaging the under side of the suspended conductor, and a weighted spring at or near the inner end of the arm for maintaining said upward contact, substantially as described.

"(16) In an electric railway, the combination of a car provided with a pivoted arm, as F, having a contact at its outer extremity, a tension spring, as G, attached at its inner extremity, and a vertically moving weight connected to said spring for holding the same in operative relation to the arm throughout its entire range of movement, substantially as described.

"(17) In an electric railway, the combination of the car having suitably pivoted arm, F, carrying a contact wheel at its outer extremity, a spring, G, secured to its lower extremity, and a connection extending from said spring, and provided with a weight at its lower end, substantially as described.

"(18) In an electric railway, the combination, with suitable contact-carrying arm, of the grooved contact wheel, and the fender spring, L, substantially as described.

"(19) In an electric railway, the combination, with branching overhead conductors, of an upwardly pressed contact arm carrying a grooved wheel embracing the conductor, and a switch plate at the branching point, adapted to receive the tips of the wheel flanges, and provided with depending ribs, between which the wheel is free to move laterally to engage with one of the branch conductors.

"(20) In an electric railway, the combination, with an overhead switch plate having depending ribs, but open at its extremities, of main and branch conductors, extending from its two extremities, respectively, a vehicle, an upwardly pressed contact arm attached to the vehicle, and tending to move laterally therewith, and a track switch for the vehicle, located so as to operate in advance of the conductor switch.

"(21) In an electric railway, the combination, with main and branch overhead conductors, of a vehicle, an intermediate contact arm thereon movable laterally with respect thereto, a spring tending to return the arm to its normal central position, a guiding switch at the branching point of the conductor, and a track switch for the vehicle, located so as to operate in advance of the conductor switch, whereby the lateral tendency of the contact device at the branching point is imparted to it by the vehicle, while its outer extremity is flexibly guided by the overhead switch from main to branch conductor.

"(22) In an electric railway, the combination, with main and branch conductors, of a vehicle, a contact arm thereon having vertical and lateral spring pressure, a switch plate for the conductors, and a track switch for the vehicle, located so as to operate in advance of the conductor switch, whereby the lateral tendency of the contact device at the branching point is imparted to it by the vehicle, while its outer extremity is flexibly guided by the overhead switch from main to branch conductor.

"(23) The combination, with branching overhead conductors, of a vehicle having a laterally swinging contact arm pressed upward to engage the conductors, and a switch plate at the branching point, having depending sides,

but open at its extremities, the interior width of the plate between the sides being greater than the thickness of the contact wheel, whereby the wheel is free to move laterally with relation to the main conductor and engage one of the branching conductors.

"(24) In an electric railway, the combination, with branching line conductors, of a track switch, a vehicle, an intermediate contact arm swinging laterally with respect to the vehicle, but provided with a spring tending to restore it to its normal central position, and a lateral deflecting switch at the branching point of the conductors, whereby the extremity of the contact arm may be flexibly guided from main to branch conductor.

"(25) In a branching electric railway, the combination of a track switch, an overhead conductor switch, and a vehicle having a rearwardly extending contact arm, whereby the track switch will operate in advance of the conductor switch.

"(26) In a branching electric railway, the combination, with a vehicle, of a track switch, an overhead conductor switch, and a contact arm extending upward from the vehicle to the conductor, and so located relatively to the length of the vehicle and the two switches that the lateral movement of the vehicle will give a corresponding movement of the contact device on the conductor switch.

"(27) In a branching electric railway, the combination, with a vehicle, of a track switch, a contact device consisting of a trailing spring-pressed arm having a grooved contact piece embracing the conductor and guided thereby, the said arm being jointed to the car and tending to move laterally therewith, and an overhead conductor switch adapted to engage the contact piece, and whereby the extremity of the arm is flexibly guided from main to branch conductor.

"(28) In a contact device, the combination, with a contact wheel, of a supporting arm therefor, having a fender for the wheel to prevent its engagement with overhead wires in case of derailment.

"(29) The combination, with wheel, E, of a supporting arm, F, provided with a fender around the wheel to prevent its engagement with overhead wires in case of derailment.

"(30) The combination, with a contact wheel for an overhead conductor, of a supporting arm therefor, having a fender bridging the angle between the wheel and arm.

"(31) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device, consisting of a trailing arm having a grooved contact wheel at its outer end, and moving laterally relatively to the vehicle, but provided with a spring tending to retain it in its normal central position.

"(32) In an electric railway, the combination, with an overhead conductor, and a vehicle, of a trailing contact arm guided at its outer end by the overhead conductor, and movable laterally relatively to the vehicle, but having a normal contralizing tendency by means of a spring or weight.

"(33) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device, consisting of an upwardly pressed trailing arm having a grooved contact wheel at its outer end, by which it is guided by the conductor, the said arm being free to swing laterally relatively to the vehicle, but tending to remain in its normal central position by means of a spring or weight.

"(34) The combination, with a vehicle and an overhead conductor, of a trailing contact arm guided normally by the conductor, but having a spring connection with the vehicle, tending constantly to maintain it in a definite position, while at the same time it is free to swing laterally with respect to the vehicle against the pressure of the said spring.

"(35) In an electric railway, the combination, with an overhead conductor and a vehicle, of an intermediate contact device, consisting of a rearwardly extending arm guided at its outer extremity by engagement with the conductor, and movable laterally relatively to the vehicle, but having a spring or weight tending to restore it to its normal central position."

The long arm, F, hinged and pivoted, etc., to a standard, f, is plainly and distinctly shown in the drawings forming a part of letters

patent No. 424,695. This precise thing is shown in letters patent No. 495,443, and also the reissue, No. 11,872. Now let us compare and ascertain what is described and patented in the reissue. Claim 1 (No. 11,872) says:

"In an electric railway, the combination of a car, an overhead conductor above the car, an upwardly extending and laterally swinging arm mounted on the roof of the car, and carrying a contact device at its free end, and making underneath contact with the conductor, substantially as described."

This omits all mention of the tension spring attached to the long arm at one end, and to a weight at the other, which is now termed the "subordinate invention."

Claim 2 (No. 11,872) says:

"In an electric railway, the combination of a car [same language as claim 1], an electric overhead conductor above the car, and parallel with the line of travel ["electric" precedes "overhead," and the words "and parallel with the line of travel" follow "car"], an upwardly extending trailing arm, carrying a contact device at its free end, adapted to make underneath contact with the conductor, said arm being supported on the car on vertical and transverse axes, so as to permit said contact device to follow the position of the conductor, notwithstanding great variations of height, and of lateral displacement thereof, substantially as described."

It is a question whether the inventor intended to make this arm a part of the contact device. He says that the arm carries a contact device. Here we have a "trailing arm" in place of a "laterally swinging arm," and in claim 1 it makes contact with the conductor, while in claim 2 it is "adapted" to make such contact; and in claim 1 it is simply mounted on top of the car, while in 2 the mode and manner of mounting the arm on the car is described, with the purpose of such mode, etc., given. Claim 2 also omits all mention of the tension spring and weight attached to the long arm, etc. In the original we find, in claims 6, 7, 8, 12, and 16 (held invalid), this arm mentioned and described, not in the exact language, but substantially the same; and, when read with the drawings and specifications, there is no doubt that it is the same, and serves the same purpose, and was intended so to do. We also find that this arm is provided at its outer end with "a contact engaging the under side of the suspended conductor [without which it would be absolutely useless and inoperative, and a mere pole or stick hung on a pivot], and a tension spring at or near the inner end of the arm for maintaining said upward pressure contact [and without which or a similar device it would be useless and inoperative]." This tension device is omitted in the reissue.

Now, turning to patent No. 424,695, we find the same arm in the drawings as before stated. We find in the specifications:

"My present invention relates to electric railways of the class in which a suspended conductor is used to convey the working current; a traveling contact, carried by the car [it is carried by the car because attached thereto and upheld by means of this arm in question], being employed for taking off the current for use in operating the motor by which the car is propelled. The return circuit is preferably completed through the rails of the track. My invention consists in certain devices and their relative arrangement, by means of which a contact device, carried by a rod or pole extending from the car [the arm in question], and pressed upwardly into contact with

the conductor, is switched from one line to another correspondingly with the vehicle. [This can only be done by means of this arm. The contact device is not now claimed as the generic invention, but the long arm, hinged and pivoted, is. See claims of complainant.] To illustrate my invention, I have shown it applied to a contact device of this description, which forms the subject-matter of my application, serial No. 230,649, of March 12, 1887; and, while I do not intend to claim generally in this application a contact device of this construction, I have made claims herein to certain details thereof which are of especial value in connection with my improved switching devices, but which are not essential features of the contact device itself, considered without reference to the switch. [The contact device only is disclaimed as a part of this invention claimed and sought to be patented, and the contact device is always described as attached to the long arm at its upper end, and carried by it. It would seem that the inventor is attempting to disconnect this long arm from the contact device entirely and absolutely.]"

Then: "More particularly, my invention consists in a track switch for the vehicle, a conductor switch for the contact device or 'trolley,' as it is termed, and the trolley itself, attached to the vehicle [attached by means of the arm]; these elements being so arranged relatively to one another that in operation the vehicle reaches the track switch and is diverted laterally before the trolley reaches the conductor switch, whereby the trolley, which partakes of the lateral movement of the vehicle, has imparted to it a laterally moving tendency before its switch is reached, and it therefore passes through the switch in the proper direction, corresponding to the movement of the vehicle. My invention also consists in various details of construction and arrangement, which will be hereinafter pointed out. [The specifications then proceed to point them out.] In the accompanying drawings, Fig. 1 is a side elevation of a car provided with my improved contact devices, and otherwise embodying my invention. [This swinging arm is fully and prominently shown, and without it there would be no connection and no utility or operative ability.] * * * E is the traveling contact wheel, and F [the arm in question] is a hinged arm supported upon a post, f, secured to, or extending upward from, the roof of the car. To the lower end of the arm, F, is attached a spring, G, to the lower extremity of which is secured a cord which passes downward through suitable grooves or over suitable rollers, and is provided with a weight, H, which serves to hold the spring down and keep the contact wheel, E, always pressed up against the under side of the conductor, D. At the same time the spring will instantly yield to allow the wheel to pass under the switch or any obstruction, and while the arm, F [the arm in question], is movable laterally with respect to the vehicle, the spring and weight will constantly tend to restore the arm to its normal central position, and assist in causing the contact arm to partake of the lateral movement of the vehicle. Being held in position by the weight, the wheel has a much greater range of action, and moreover the motorman can at any time lower the contact wheel by raising the same [the arm in question], rendering the arrangement very convenient for many purposes."

Then follows a full description of the arm, F, its construction and uses. Then:

"I believe myself to be the first to devise this arrangement of contact device and switches, whereby the lateral movement of the vehicle is first imparted to the trailing contact arm, and the contact wheel [at the end of the arm] is then flexibly, yet without interruption of the contact, drawn into the switch, and guided thereby into engagement with the desired branch conductor; and I intend herein to claim broadly any relative arrangement of track switch, conductor switch, vehicle, and contact device by means of which the former switch will act in advance of the latter, and the vehicle impart a lateral tendency to the trailing contact [the arm in question being an essential part] by the time it engages with the conductor's switch. The contact-carrying arm described in the present application possesses substantial practical advantages over any other means yet proposed for es-

tablishing moving contact between a vehicle and a stationary supply conductor, in that by the use of a hinged, flexibly mounted arm much greater freedom of movement is compatible with the maintenance of a positive mechanical connection and electrical contact between the vehicle and supply conductor."

Then follow 35 claims, and claim 4 reads as follows:

"The combination of a track having switches, an overhead conductor above the track, and having switches, and a car on the track, provided with a contact-carrying arm arranged to engage the conductor at a point in rear of the front wheels of the car."

The next claim (5) has "provided with an upwardly extending arm carrying a contact wheel," etc., "substantially as described." In 22 of these claims this now so-called generic invention is specifically mentioned as claimed, and at least three times it is described as the arm, F, and claim 31 reads:

"In an electric railway, the combination with an overhead conductor and a vehicle, of an intermediate contact device consisting of a trailing arm having a grooved contact wheel at its outer end, and moving laterally relatively to the vehicle, but provided with a spring tending to retain it in its normal central position."

In this patent, No. 424,695, what is now termed the "generic invention" (the arm, etc.) is described and claimed with much greater stress and detail and particularity than is the so-called subordinate invention, the spring and weight, and it is given much more prominence. Indeed, without it the usefulness of the whole structure is gone. If this so-called generic invention was not patented here by No. 424,695, then the so-called subordinate invention was not; and, if the Circuit Court of Appeals were correct in their holdings in the cases cited (Thomson-Houston Electric Co. v. Hoosick R. Co., 82 Fed. 461, 27 C. C. A. 419; Thomson Houston Electric Co. v. Union Ry. Co., 86 Fed. 636, 30 C. C. A. 313, and Thomson-Houston Electric Co. v. Jeffrey Mfg. Co., 101 Fed. 121, 41 C. C. A. 247), it must be held that reissued letters patent No. 11,872 are void.

Letters patent No. 424,695 expressly describe and claim the intermediate contact device, consisting, as the patent expressly says, of this trailing arm carrying a contact wheel.

In Thomson-Houston Electric Co. v. Hoosick Ry. Co., 82 Fed. 468, 27 C. C. A. 419, Judge Wallace, in giving the opinion of the court, and passing on patent No. 495,443, says:

"It is manifest that both patents are intended to, and do, secure to the patentee the same general inventions as are comprised in the combination of suspended conductor and contact devices, and the combination of suspended conductor, contact device, and switching devices, although the earlier patent also covers improvements in the switches and subordinate combinations between these devices and the elements of the principal combination. Claim 13 of the patent in suit, for the combination between the suspended conductor, the contact device, and the switching devices, is identical in its phraseology with claim 6 of the earlier patent. That claim reads as follows: '(13) In an electric railway, the combination of an electrically propelled car, a supply conductor suspended over the line of travel of the car, a swinging arm mounted upon the car, and carrying a contact device at its free end, said contact arranged to bear against said conductor, suitable switching devices upon the track traversed by the wheels of the car, and

corresponding switches on the suspended conductor located above those on the track, and arranged to engage the contact devices, substantially as described.' The later patent describes the switching devices of the earlier patent in all their essential features, except as to the subordinate improvements thereon, and claim 13 must be construed as specifying the identical invention specified in claim 6 of the earlier patent. On the other hand, claim 15 of the earlier patent, for the combination between the suspended conductor and the contact device, is identical in phraseology with claim 9 of the patent in suit. The switching devices having been fully described, the matter of disclaimer inserted in the later patent is of no more value in determining its scope and interpretation as to the claims in which the switches are an element than is the matter of disclaimer inserted in the earlier patent as to the claims in which the contact device is an element. We are of the opinion that claim 15 of the earlier patent describes and embraces everything of substance which is covered by claim 7 of the patent in suit. Claim 15 specifies a combination the elements of which are the car (implied necessarily, and needlessly mentioned), the suspended conductor, and the contact device. The element termed 'a contact-carrying arm pivotally supported on the top of the car, and provided at its outer end with a contact roller engaging the under side of the suspended conductor,' exactly defines all the essential features of the contact device described in each specification, except the tension device. It must be hinged as well as pivoted; otherwise the tension device will be inoperative to maintain upward pressure. The element termed 'a weighted spring' is the complete tension device described in both specifications, and which, as described, necessarily exercises the twofold function of maintaining upward contact between the contact device and the suspended conductor, and of maintaining the pivoted arm in its central or normal position. The 'tension device' of claim 7 is the whole device described in that patent, as the 'weighted spring' of claim 15 is the whole device described in the earlier patent. Claim 15, however, does not specify the combinations of claims 8, 12, and 16 of the patent in suit. The 'tension spring' of those claims is not necessarily the 'weighted spring' of claim 15. We are also of opinion that claim 33 of the earlier patent specifies essentially the same combinations embraced in claims 8, 12, and 16 of the patent in suit, and that the 'spring or weight' of claim 33 is the same thing as the 'tension spring' of claims 8, 12, and 16, the 'weight' being only an alternative element. It would be a waste of time to dwell upon the verbal differences in these claims. The changes in phraseology import nothing of substance into their respective combinations. They describe the same things in different language, and the draftsman seems to have expended great ingenuity in cataloguing a group of synonyms."

This court has examined this case with great care, desiring to sustain the reissue, if possible, giving full weight to the presumption of validity that obtains in the first instance.

In Thomson-Houston Electric Co. v. Union Ry. Co., 86 Fed. 636, 30 C. C. A. 313, means for maintaining the contact device and the conductor in their normal working relations were construed into patent No. 495,443 by implication, because absolutely necessary to an operative combination. In giving the opinion, the court says:

"It is insisted for the appellants that the two claims now in controversy are for the same combination specified in some of the claims which were then held to be void. The appellee contends that they are not, because they omit to specify any means for holding the contact device in underneath contact with a conductor, and consequently can be construed as covering a subcombination in which such means are not employed, or, if such means must be read into the claims by implication, the claims are not limited to the means described in the specification, and that upon either construction they are not the claims of the earlier patent. The court below adopted this view. If the appellants are right, no other question need be

considered. It will be seen that these claims are for identical combinations, except that the arm is differentiated in each by functional characteristics. The specification describes a traveling arm carried by a post on top of the car, 'which is hinged, and should in most instances be also pivoted, to the top of the post, although a reasonable amount of looseness in the hinged joint will answer the purpose of the pivot.' When pivoted, 'it swings freely around a vertical axis,' and meets the terms of claim 2. When hinged and loosely jointed, it is 'movable on both a vertical and transverse axis,' and meets the terms of claim 4. We do not entertain any doubt that there must be incorporated into these claims, by implication, means for maintaining the contact device and the conductor in their normal working relations. Without them, there is really no 'traveling' contact device, and no operative combination, and the claims would cover merely an aggregation of devices which do not coact unless assisted by some instrumentality which must be discovered and supplied. The function of the arm, as constructed and arranged, is to establish 'moving contact,' while maintaining a positive mechanical connection between the vehicle and the conductor. It was devised because, as previously mounted, the contact device was found to be deficient in capacity to follow the sinuosities and deflections of the conductor while the car was in motion. It can only perform this function by the aid of some instrumentality which holds it constantly in the proper relations to bridge the space between the car and the conductor, and keep the contact device and the conductor in electrical connection. As pointed out in the specification, this consists of a tension device operating upon the arm, and maintaining a constant upward pressure, thus holding the contact device to the conductor. This tension device, or its equivalent, is an indispensable element of the respective combinations. That the proper construction of the claims is as thus indicated is evidenced by the proceedings upon interference in the patent office. Claim 2 is a literal statement of the issue defined and formulated by the patent office between what was then claim 1 of the application and the claims of two interfering applications. Claim 1 was as follows: 'In an electric railway, the combination, with a suitable contact, and the supply conductor suspended above the track, of a car provided with a swinging arm, carrying a contact device in its outer extremity, and means for imparting upward pressure to the outer portion of the arm and contact, to hold the latter in ·continuous working relation with the under side of the supply conductor, substantially as described.' In formulating the issue, the office omitted, as unnecessary, because necessarily implied, the elements enumerated in claim 1 of the application, which are not enumerated in claim 2 of the patent. One of these elements was 'means for imparting upward pressure to the outer portion of the arm and contact.' This element was apparently thought to be as indispensable to the operativeness of the combination of the claim as was 'a suitable track,' an element also omitted. The appellee concedes that the claims are for combinations specified in other claims of the patent, which by our former decision were held to be void, if they require the construction which we have placed upon them. Indeed, claim 6, which we held to be void, is identical in terms with claim 1 of the interference proceedings—the claim which the patent office regarded as embodying the invention covered by present claim 2. The rule of construction which usually obtains, whereby the several claims of a patent are to be differentiated so that effect may be given each, cannot be reasonably invoked in behalf of this patent, where so many of the claims are duplicated."

Then of what avail to take out reissued letters patent, omitting that which the court put in by implication as absolutely necessary to a traveling contact device, and without which there would be no operative combination—only a combination of devices that would not coact? In short, the court put in by implication the means for maintaining the contact device in contact with the conductor, as without it the patent would be void as a mere aggregation of devices destitute of coaction, and held that with such means the device had been al-

ready patented, and was therefore void. The complainant now describes the same device described and claimed in the earlier patent (424,495), leaving out the means for maintaining this contact, and claims a valid patent. This court does not understand that the Court of Appeals in the Sixth and Second Circuits held the original patent void for the reason that the specifications accompanying the claims were in any manner defective, or in failing to distinguish the so-called generic invention—the long arm adapted to make connection with the conductor—from the specific form of it selected for illustration. A reference to those cases, already made, and an examination of them, do not sustain this contention. This court fails to find that the patent in question was either inoperative or invalid by reason of either a defective or an insufficient specification, or by reason of the patentee having claimed as his own invention or discovery more than he had the right to claim as new, or, if such error occurred, that it arose from either inadvertence, accident, or mistake. The reissue attempts to carve out from an invention, complete operative structure, patented as a whole, a part thereof, which, standing alone, shows no novelty or invention, and patent it; something that alone is inoperative and useless in the trolley art—not new, for it is an arm or pole hinged and pivoted on a post in the old way, and might be used in the old way to raise any weight attached to one end by the application of downward pressure at the other.

In Miller v. Eagle Manufacturing Company, 151 U. S. 186, 14 Sup. Ct. 310, 38 L. Ed. 121, it is decided that:

"No patent can issue for an invention actually covered by a former patent, especially to the same patentee, although the terms of the claims may differ. The second patent, in such case, although containing a claim broader and more generical in its character than the specific claims contained in the prior patent, is also void. But where the second patent covers matter described in the prior patent, essentially distinct and separable, and distinct from the invention covered thereby, and claims made thereunder, its validity may be sustained. A single invention may include both the machine and the manufacture it creates, and in such case, if the inventions are separable, the inventor may be entitled to a monopoly of each. A second patent may be granted to an inventor for an improvement on the invention protected by the first, but this can be done only when the new invention is distinct from and independent of the former one."

It will be noted that, to avoid double patenting, the matters described in the prior patent must be essentially distinct and separable, and distinct from the invention covered thereby, and the claims made thereunder. In the case now under consideration the opposite is the fact. The matters described in the earlier patent are not distinct and separable, or distinct from the invention covered thereby or the claims made thereunder. The claims made under the first patent are the same as those made under the original and the reissue. Language is changed, but the same thing is not only illustrated but described in the specifications, and distinctly and unequivocally claimed. See, also, Suffolk Company v. Hayden, 3 Wall. 315, 18 L. Ed. 76; James v. Campbell, 104 U. S. 356, 370, 382, 26 L. Ed. 786; Mosler Safe Co. v. Mosler, 127 U. S. 354, 8 Sup. Ct. 1148, 32 L. Ed. 182; McCreary v. Pennsylvania Canal Company, 141 U. S. 459, 12 Sup. Ct. 40, 35 L. Ed. 817; Underwood v. Gerber, 149 U. S. 224, 13 Sup. Ct. 854,

37 L. Ed. 710; Odiorne v. Amesbury Nail Factory, 2 Mason, 28, Fed. Cas. No. 10,430. There are other cases to the same effect.

It is not intended to hold that a distinct part of an operative mechanism or structure may not be patented, or that several distinct parts may not be each the subject of a distinct patent; but they must be patented with reference to and as a part of that structure, or some operative structure as a basis. If the structure described be a complete and an operative one, composed of several coacting parts, and it is described and claimed and patented as a whole, especially when each part is separately described and claimed, no other valid patent for one of those parts (especially to the same inventor) can be issued, although an improvement on the structure or on one or more of such parts may be. Here we have this arm as an essential support for the contact wheel, it being repeatedly stated that the arm supports or carries the contact device, not only described with great particularity of detail in the specifications of the earlier patent, but claimed repeatedly, specifically, and unequivocally in the numerous claims of that patent. It matters little what it was named in the earlier patent, or in the later patent, or in the reissue. The crucial test is, was the same thing clearly described and claimed in the specifications and claims of both patents? If so, the later patent is void.

In Thomson-Houston Electric Co. v. Elmira & H. Ry. Co. (two cases) 71 Fed. 396, 18 C. C. A. 145, we find the Circuit Court of Appeals in the Second Circuit holding:

"(1) Patents—Two Patents for Same Invention—Identity of Claims. In determining whether two patents to the same person cover the same invention, so as to render the later one void, the test of identity is whether the claims of both, when properly construed in the light of the descriptions, define essentially the same thing.

"(2) Same. A machine or structure may embody several different inventions; and, while two or more inventions residing in the same combination or structure may be covered by different claims in the same patent, they may, at the option of the patentee, be secured by different patents. And it is immaterial that both inventions originate at the same time, and from a single conception.

"(3) Same—Minor Improvements. The granting of patents for distinct and specific structural improvements pending an application for the broad invention will not invalidate a patent subsequently granted for the latter, although the elements covered by its claims were described and illustrated, but not claimed, in the earlier patents. Thomson-Houston Electric Co. v. Elmira & H. Ry. Co. (C. C.) 69 Fed. 257, affirmed."

In the opinion the court said:

"The principles of law applicable to the case may be briefly stated. An inventor, by describing an invention in a patent granted to him, does not necessarily preclude himself from patenting it subsequently. His omission to claim what he describes may operate as a disclaimer or an abandonment of the matter not claimed; but it has no such effect when it appears that the matter thus described, but not claimed, was the subject of a pending application in the Patent Office by him for another patent. This was explicitly adjudged in Suffolk Co. v. Hayden, 3 Wall. 315, 18 L. Ed. 76, and recognized as sound doctrine in the Barbed Wire Case, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154. The invention secured by a patent is that which is secured to the patentee by the claim. The claim is a statutory requirement prescribed for the purpose of making a patentee define what his intention is so distinctly and exactly as to apprise other inventors and the

public what is withdrawn from general use. The claim, however, is to be read in the light of the description contained in the specification, and its literal terms may be enlarged or narrowed accordingly, but not to an extent inconsistent with their meaning. Identity of language in the claims of two patents does not necessarily import that the invention patented by each is identical, nor does a difference in phraseology necessarily import that they are for different inventions. The test of identity is whether both, when properly construed in the light of the description, define essentially the same thing. When the claims of both cover and control essentially the same subject-matter, both are for the same invention, and the later patent is void."

It is evident that in the earlier patent, No. 424,695, the inventor made no attempt and had no purpose to exclude this trailing arm, hinged and pivoted, and make it the subject of a separate patent, but, on the other hand, intended to include and patent it, as he did include it in the claims, and to describe it and its uses, as he did describe it in the specifications of that patent. What was intended to be excluded from No. 424,695, and made the subject of a separate patent, was the "contact wheel"—"E is the traveling contact wheel"—carried by this arm, and not the arm, now claimed as the generic invention, and alleged to be the thing intended to be reserved from No. 424,695, and made the subject of a separate patent. What is now claimed to be the generic invention and described and claimed in reissued letters patent No. 11,872, dated November 13, 1900, to wit (using the description of complainant's counsel), "a long arm hinged and pivoted so as to be capable of swinging both vertically and horizontally through long arcs, and mounted on the top of an electric car, and adapted for making contact with the under side of an overhead suspended wire," was described, claimed, and patented in letters patent No. 424,695, dated April 1, 1890, to the same inventor, and such reissued letters are void, and letters patent No. 495,443, was neither invalid nor inoperative by reason of defective or insufficient specifications, or by reason of the patentee claiming therein as his own invention more than he had a right to claim as his own; and such arm, so hinged and pivoted, standing by itself, even in the combination, is old, displays no novelty, and is clearly lacking in invention.

The bill of complaint must be dismissed, with costs. A decree will be entered accordingly.